**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MATTHEW TIGHE**, | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **1:11-cv-224** |
| | ) |
| **ERIC J. PURCHASE**, *personal administrator of* | ) |
| *the Estate of Mona Buschak, individually and in her* | ) |
| *official capacity as President of the General McLane* | ) |
| *School Board*; **RICK SCALETTA**, *individually and* | ) |
| *in his official capacity as school superintendent*; and | ) |
| **THE GENERAL MCLANE SCHOOL** | ) |
| **DISTRICT**, | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM OPINION

The following motions are pending before the Court:

(1) the MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 63) filed by Matthew Tighe ("Plaintiff") as to Counts I through IV of the Amended Complaint;

(2) the MOTION FOR SUMMARY JUDGMENT OF DEFENDANT GENERAL MCLANE SCHOOL DISTRICT (ECF No. 66); and

(3) the MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS MONA BUSCHAK AND RICK SCALETTA (ECF No. 70).

The motions have been extensively briefed (ECF Nos. 65, 69, 73, 75, 76, 88, 89, 91, 92), and the factual record has been thoroughly developed via the parties' concise statements of material fact ("CSMF"), their responsive and supplemental CSMF, and the attached appendices (ECF Nos. 64, 67, 68, 71, 72, 79, 81, 87). Accordingly, the motions are ripe for disposition. For the following reasons, Plaintiff's motion will be **DENIED** in all respects, while each of Defendants' motion will be **GRANTED IN PART** and **DENIED IN PART**.

1

## I.      Background

### A.      Factual Background

This civil rights action arises from events occurring at a series of General McLane School Board ("School Board") meetings on August 18, 2010; October 20, 2010; November 17, 2010; and December 8, 2010. Plaintiff lives in the General McLane School District ("School District"). From May 2009 until December 2010, he attended every regular School Board meeting, often using time during the public participation period to voice criticisms of the School Board and the School District.[1] Mona Buschak ("Buschak"), who is now deceased, was the president of the School Board from December 2007 until December 1, 2010. In that capacity, she presided over all but the December 8th meeting of the School Board.[2] Rick Scaletta ("Scaletta") became the School's superintendent in July 2010 and attended each of the meetings at issue.

---

1.      While Plaintiff's claims relate only to the August 18th, October 20th, November 17th, and December 8th meetings, his history with Defendants stretches beyond those four dates. He started to attend School Board meetings in May 2009 because he was interested in the School District's proposal to build a wind turbine on its property. He apparently believed that his excavating company would be able to win a bid to become either the primary contractor or a subcontractor on the project. During the same time, Plaintiff submitted some 70 Right-to-Know requests to the District, seeking a range of documents related to, *inter alia*, the District's application for state funding for the project and a wind assessment report prepared for the project. Believing that the wind assessment report contained confidential information, the School District decided to release it in redacted form. Plaintiff appealed that decision to the Pennsylvania Office of Open Records ("O.O.R."), which eventually ruled partially in his favor, holding that the District's claim of confidentiality was unsubstantiated and ordering it to disclose an un-redacted version of the report. In September 2009, the School District scuttled the wind turbine project for good, after having determined that the bidding process was compromised by the release of the wind assessment report and after failing to receive a state grant. Plaintiff continued to attend Board meetings after the project was cancelled. When his daughter was the alleged victim of bullying in January 2010, he primarily turned his attention to the District's handling of that issue; altogether, he discussed it as part of his presentations at the February 17th, March 17th, April 14th, April 21st, May 19th, June 9th, and July 21st meetings.

2.      On December 1, 2010, Melodee Kushner ("Kushner") succeeded Buschak as School Board president. Kushner presided over the December 8th meeting, after which the criminal charges were filed against Plaintiff. She is not, however, named as a Defendant in this case.

*Policy 903*

In accordance with Pennsylvania's Sunshine Act,[3] the School Board set aside time at the start of each of its regular monthly meetings for public participation (the "Recognition of Visitors" portion of the meeting). The Board regulated the public's participation at its meetings through Policy 903, two versions of which were in effect during the relevant time. Under the original version of the Policy, which was in effect until October 20, 2010, speakers who called ahead and got their names listed on the meeting's agenda could speak for 10 minutes; all other speakers were afforded 5 minutes. The presiding officer, moreover, was given the authority "to declare any persons out of order if they (a) stray from the topic, (b) become obscene, loud, or abusive, (c) become slanderous." The School Board gave the amended Policy a first reading at its September 15th meeting, and formally adopted the amended Policy at the October 20th meeting. The amended Policy gives speakers five minutes to speak if their name appears on the agenda and three minutes otherwise, they are not permitted to speak more than once on the same topic, and their comments cannot be repetitive or duplicative of comments they previously presented to the Board. In addition, the presiding officer may:

> 1. Interrupt or terminate a participant's statement when the statement: goes over the prescribed time limit; interferes with the orderly conduct of the meetings; is directed to a person other than the presiding officer; is abusive, obscene, loud, defamatory, harassing, accusatory, threatening, irrelevant, related to matters properly considered in executive session, or repetitious of prior presentations; is on a topic other than matters of concern, official action or deliberation before the Board; includes interrogation of the Board or any individual Board member or other meeting participant; includes allegations against or information relating to any individual to whom a duty of confidentiality is owed by the district; or is deemed to be out of order for any reason.

---

3.      Under 65 Pa. C.S.A. § 710.1(a), the Board is required "to provide a reasonable opportunity at each advertised regular meeting and advertised special meeting for residents. . . or for taxpayers . . . or for both to comment on matters of concern, official action or deliberation which are or may be before the board or council prior to taking official action."

2. Request any individual to leave the meeting when that person does not observe reasonable decorum or does not follow the directions of the presiding officer regarding content violations as described in 1. above.

3. Request assistance of law enforcement officers to remove a disorderly person when his/her conduct interferes with the orderly progress of the meeting.

4. Call a recess or adjourn to another time when the lack of public decorum interferes with the orderly conduct of the meeting.

5. Waive these rules with the approval of the Board.

### *The August 18th Meeting*

Plaintiff was recognized as a speaker during the Recognition of Visitors session and given 10 minutes to speak. At the start of his presentation, he identified himself and provided his address as required by Policy 903. Then, announcing his topic of discussion, he said, "I'm here to criticize the Board and the administration for their lack of openness, transparency and accountability, and if time allows I might even give some well deserving person some praise tonight." Before beginning his remarks, he added, "[d]on't hesitate to call me out of order, please, if I'm not following protocol." Plaintiff proceeded to read aloud from an e-mail that he sent to Scaletta, setting out a number of criticisms of the Board and the District. Plaintiff finished reading the e-mail approximately six minutes into his presentation, and then the following exchange took place, as reflected in the notarized transcript of the recording of the meeting submitted by Plaintiff:

> Plaintiff: Madame President, you mischaracterized [sic] at the last Board meeting. Some people were up here that went past their five minute rule. And I'd to make it known to you that I don't appreciate your mischaracterization of . . . [4]

---

4.     It is not entirely clear from the record what Plaintiff was referring to when he accused Buschak of mischaracterizing him. According to Plaintiff, at the September meeting, Buschak stopped other members of the public from speaking past their allotted time and suggested to them that she had to do so because Plaintiff was recording the meeting. According to Defendant,

Buschak: I think that is enough Matt. I am not going to sit here and have you bad mouth me or anybody else on this Board. The timer was set for five minutes. I'm not going to –

Plaintiff: Now, Madame President, I refuse – I absolutely refuse –

Buschak: Then, sit down.

Plaintiff: . . . to allow you to mischaracterize me. You can call me names, you can do anything you want to me, but you will not mischaracterize me. I am here to –

Buschak: You are out of line now, okay?

Plaintiff: And what Robert's Rule of Order am I out of order.

[Buschak pounds her gavel.]

Buschak: You can sit down now.

Plaintiff: I refuse to sit down. I have my ten minutes. I will not sit down. Tell me which Robert's Rules of Order I am out of order.

Buschak: We can call the cops.

Scaletta: Matt, you're going to have to leave now.

Plaintiff: No, I'm not leaving.

Scaletta: You are out of control.

School Board Solicitor James McDonald ("McDonald"): You realize it's a crime to violate the directive of a school official to leave the property?

Plaintiff: She cannot tell me which – tell me which Robert's Rule I am out of order on.

McDonald: We just want to warn you that it is a crime not to leave after you have been asked to leave.

Plaintiff: Uh, call the state police?

McDonald: Right.

---

Buschak insinuated that Plaintiff would become angry if she did not require speakers to keep their comments within the time limit.

5

Buschak:  We are going to move on to the next order of business.

Plaintiff:  I'm here to stay. I will not yield the floor.

Buschak:  I asked you to sit down.

Plaintiff: Call the State Police. I am here to stay. I will not yield the floor. Madame President, I am here to increase the communication; not lessen it.

Buschak: I asked you to sit down. Sit down.

Plaintiff: I am not sitting down. You can call the state police. I am perfectly willing to be escorted out of here by the police.

Buschak: We will recess until this matter is over.

[Scaletta gets up from the table and approaches Plaintiff.]

Scaletta: Have I not tried to address your concerns? Have I not answered every letter?

Plaintiff: You're Charlie?

Unidentified Speaker: Okay.

Plaintiff: Mr. Scaletta?

Scaletta: Will you please listen to her?

Plaintiff: Sure. But, I need to make this point clear, and I will do that. I'm perfectly willing to be escorted out of here by the State police. If these people can't tell me how I am out of order, then –

Scaletta: We will tell you – you are not –

Plaintiff: That's fine. I'm willing to suffer the consequences. If you people can't tell me why I am out of order on, I'll suffer the consequences. If this is a crime –

Scaletta: You are being abusive toward the President of this organization.

Plaintiff: No, I am not. I beg to differ. Now, okay, now that I have addressed that I am here for increased communication, I'll continue on and when my ten minutes are up, you can be free to shut me off. But, uh, the mission statement. Can anyone tell me here what the School District's mission statement is?

Buschak: You're off topic.

Plaintiff: Uh – I'll sit – are my ten minutes up?

Buschak: Yes, they are.

Plaintiff: How can they be up? It's 6:38. I didn't start till 6:31.

Buschak: Your time was up when I said you crossed the line and I have the right to ask you to sit down. Board Policy 903: If people become – break from the topic, become obscene, loud, or abusive, and become slanderous, then you are crossing the line, and I told you to sit down – and I am done. You're done.

Plaintiff: Which one of those incidents was I out of order on, Madame President?

Buschak: This is not a discussion.

Plaintiff: It's not a discussion, but you're calling me out of order. How can I be out of order if you can't cite to me which incident I'm out of order on?

Buschak: Not sitting down when I told you to sit down.

Plaintiff: I was in no way trying to be abusive to you. I was trying to make a point. You mischaracterized me and –

Buschak: As you do us all the time.

Plaintiff: Madame President, I beg to differ with you on that. Now, since no one cares about the mission statement, I'd like to read the mission statement to the School Board. "The mission of the General McLane School District is to provide a quality education and a caring environment that inspires students to achieve their potential to become life long learners and responsible members of society." Nobody cares about the mission statement?

\*\*\*

Plaintiff: Okay, well, it's 6:41. I didn't hear the beeper go off, but I know my ten minutes are up and I'm willing to be escorted out of here when the state police –

In the meantime, either Business Manager Jeff Fox ("Fox") or Solicitor McDonald called the state police. Moments later, Plaintiff observed a state trooper enter the building. When he saw the trooper, "[he] knew he was in trouble." So, in an effort to defuse the matter, he left the meeting room and approached the trooper. The trooper advised Plaintiff that he had been called

to restore order to the meeting and that charges could be filed against him for refusing to cede the floor when Buschak told him to do so. The trooper then directed Plaintiff to leave the premises. Plaintiff complied with the trooper's directive without incident; he was not placed under arrest or physically restrained in any manner.

Following the incident, the state trooper also met with Scaletta and McDonald. During this conversation, the trooper suggested that the School Board should provide Plaintiff with a set of guidelines to govern his behavior at future Board meetings. On August 24th, Scaletta sent Plaintiff a letter, drafted in consultation with Solicitor McDonald, "to follow-up" on the August 18th meeting. In accordance with the state trooper's suggestion, the letter told Plaintiff that if he wished to speak at future meetings he had to abide by certain restrictions – restrictions that were not found in the version of Policy 903 that was then in effect, but that would become part of the amended version of the policy in October. Among other things, Plaintiff would be required to address all of his comments to the Board president or presiding officer and not to any particular Board member. Furthermore, his comments had to relate to topics on the meeting's agenda or before the Board for consideration; could not be repetitive or duplicative; could not amount to interrogation of individual Board members; could not be obscene, loud, abusive, or defamatory; could not include allegations against individuals to whom the District owed a duty of confidentiality; and could not be disruptive of the meeting or otherwise interfere with the orderly conduct of the Board. The letter also indicated that "lack of compliance with these requirements may result in your presentation being terminated, your removal from the school premises, and appropriate legal action being instituted."[5]

---

5. The parties dispute whether the restrictions found in the letter were applied evenhandedly between when it was sent to Plaintiff on August 24th and when Policy 903 was formally amended on October 20th. Defendants argue that the School Board announced the policy change

*The October 20th Meeting*

Plaintiff was listed as a speaker during the Recognition of Visitors portion of the October 20th meeting. At the beginning of his presentation, he announced, "The topics of my presentation tonight will be on bullying and if time allows I would like to make a few comments on the request made by the Township." Although the amended version of Board Policy 903 was not yet in effect – it was not formally adopted until *after* the Visitors' Recognition portion of this meeting – Buschak informed Plaintiff that because bullying was not one of the Board's topics that evening, he would not be able to present. The following exchange then took place:

> Plaintiff: Uh, Madame President, I've had some extensive discussions with my attorney, and he suggested to me that I suggest to you that you consult with your solicitor tonight so that you don't suppress my First Amendment rights.
>
> Buschak: Mr. Tighe, you have First Amendment rights, but the guidelines for addressing the Board is the comments have to relate directly to a topic at the meeting, on the agenda, or something before the Board tonight to consider. Bullying is not one of those topics, so –
>
> Plaintiff: I'm perfectly aware of your policy. My attorney is perfectly aware of your policy. Let me do this: I am going to speak about bullying tonight, and if – as a courtesy I'll yield the floor so you can consult your solicitor –
>
> Buschak: There's no reason to –
>
> Plaintiff: But I'm not going to take away my ten minutes.

---

at the September 15th meeting and applied the new restrictions to every member of the public who wanted to speak during the Visitors' Recognition period thereafter. Plaintiff disagrees, contending that the Policy did not have widespread effect until it was formally adopted mid-way through the October 20th meeting. Even after that, Plaintiff alleges, the School Board did not enforce the agenda-item restriction against all members of the public but instead continued to permit certain visitors to speak on topics of their choosing. Plaintiff identifies three such incidents. First, on May 18, 2011, Ginny Keim requested the Board's approval on her request to host a foreign exchange student, and the Board voted to approve her request, even though the topic did not appear on the meeting's agenda. Second, on September 21, 2011, Michelle Roberts addressed the Board regarding her daughter's bus stop location, even though that was not a topic that the Board had planned on discussing at this meeting. Third, on April 13, 2011, Joe Cieslek spoke to the Board about his Boy Scout troop, which was not an agenda-item that evening.

Buschak: I'm also, I'm also not going to allow you to talk about a topic that's not in front of the Board right now and not follow the guidelines, so I'm going to ask you not to speak about it, and if you continue to want to speak about it, I will ask you to leave. And we can go through that whole process again.

Plaintiff: Okay. That – you know what? Madame President, I'm perfectly – before you make this mistake, I'll yield the floor. I'll give you the courtesy to consult with your solicitor. Now, if you don't want to do that, I'll just continue on.

Buschak: There are two things, Matt. One, is you have to address what is on the agenda. This is according to our Board policy that we are to follow. Number two is you cannot keep repeatedly talking about the same topic. You have already addressed us about the bullying policy before. So, therefore, I'm giving you the opportunity to reconsider, because I will not allow you to speak on those two topics, and if you continue to speak, we will stop our meeting and call the cops. So you can either sit down or leave.

When Plaintiff refused to yield the floor, Buschak adjourned the meeting and told Plaintiff that he had to sit down or leave. Instead, Plaintiff continued with his presentation. Meanwhile, most the Board members got up from the conference table and left the room, leaving Plaintiff to finish the his presentation in front of a near-empty audience. When Plaintiff's presentation ended, the Board members who had left returned to the room, and the meeting continued.

### The November 17th Meeting

At the start of November 17th meeting, Plaintiff announced that he would be speaking about bullying. Buschak ruled him out of order, informing him that he was not permitted to speak because bullying was not the meeting's agenda. Plaintiff complied and returned to his seat without incident.

### The December 8th Meeting

Plaintiff made a five-minute presentation during the Recognition of Visitors portion of the December 8th meeting. Afterwards, he returned to his seat, and the Board continued with its regular business. Later, as the Board was about to approve the minutes from the prior month's meeting, Plaintiff called out "point of order" from the gallery. Kushner, who by now had

succeeded Buschak as School Board president, exclaimed that Plaintiff was not "a part of this process" and directed him to sit down. A back-and-forth then ensued between Kushner and Plaintiff.

During that exchange, McDonald and Fox left the meeting, and one of them called the state police. Two state troopers arrived within minutes. Plaintiff observed the troopers in the hallway outside the Board meeting room and, just as he had done during the August meeting, decided to approach them to try to calm the situation down. Scaletta, Fox, and McDonald then joined the conversation. At some point thereafter, the troopers directed Plaintiff to leave the building. Before Plaintiff left, the troopers escorted him back into the Board meeting room, where he was permitted to gather his camera equipment before being escorted out. Plaintiff was not formally arrested, and there is no evidence that he was physically restrained or touched in any manner by the troopers.

### The Subsequent Criminal Prosecution

After the December 8th meeting, the Pennsylvania state police, in consultation with the District Attorney's ("DA") office, filed a criminal complaint against Plaintiff charging him with disorderly conduct. A few weeks later, Plaintiff received a summons in the mail notifying him of the charge and directing him to appear at the state police barracks for fingerprinting and to attend a preliminary hearing on February 1, 2011. At the preliminary hearing, Assistant DA Robert Sambroak ("Sambroak") amended the criminal complaint to include a charge for "disrupting meetings and processions," in violation of 18 Pa. C.S.A. § 5508. After hearing testimony from McDonald and Scaletta, the magisterial district judge ("MDJ") dismissed the disorderly conduct charge but held the disruption charge over for trial. Following the hearing, Plaintiff was released on bond, as a condition of which he was not permitted to attend School Board meetings.

On July 29th, Sambroak and Plaintiff reached an agreement to seek a *nolle prosequi* of the disruption charge. As Sambroak explained in his motion seeking the *nolle prosequi*:

> The parties have reached an agreement to resolve this case. As part of the agreement the defendant will not attend school board meetings until the scheduled December, 2011 meeting. In the event the defendant violates this agreement by appearing at a school board meeting before December, 2011 the Commonwealth will reinstate the charges and proceed to trial with all time for Rule 600 purposes running against the defendant until the day of trial. Otherwise, the case is nolle prossed with prejudice.

> The Commonwealth represents it has sufficient evidence to prosecute this case and that the nolle prosse is being sought solely in the interest of justice.

> The parties also recognize the maximum penalty defendant faces if he is convicted of this charge is one year in prison. Under the terms of the agreement the defendant will have been barred from attending school board meetings for approximately one year.

Sambroak expounded on his reasons for seeking a *nolle prosequi* in his deposition, explaining that "the case had gone on long enough. Our office had already invested far too much time in it for a misdemeanor of the third degree . . . We had accomplished the goal I wanted to accomplish in keeping him out of school board meetings for a year. And to me, that was enough." After the *nolle prosequi* was entered, Plaintiff succeeded in having his record expunged, with no objection by Sambroak.

### B. Procedural History

On September 27, 2011, Plaintiff initiated this action under 42 U.S.C. § 1983 by filing a Complaint against Buschak and Scaletta, in their individual and official capacities, and the School Board, alleging violations of the United States Constitution, the Pennsylvania Constitution, and Pennsylvania common law. Compl. ¶¶ 30-72 (ECF No. 1). Defendants responded by filing a motion to dismiss several aspects of the Complaint. Def.'s Mot. to Dismiss at 1 (ECF No. 7). On December 19, 2011, Plaintiff filed an Amended Complaint that substituted

the School District as a Defendant in place of the School Board, removed the counts based on the Pennsylvania Constitution, and clarified that the false arrest and malicious prosecution claims were based on § 1983 and not Pennsylvania law. *See* Pl.'s Mot. for Leave to Am. at 1 (ECF No. 10); Am. Compl. ¶¶ 30-58 (ECF No. 11). As a result, the Amended Complaint raises the following claims: Count I, "First Amendment Violation-Free Speech;" Count II, "First Amendment Violation-Right to Petition;" and Count III, "Official Oppression and Intimidation" against Buschak and Scaletta, arising out of the August 18th meeting; Count IV, "Denial of Right to Speak and be Heard by the School Board of Directors" against the "defendant School Board"[6] arising out of the October 20th meeting; Count V, "Violation of First Amendment Right to Speak in a Public Forum," against Buschak, arising out of the November 17th meeting; and Count VI, "Official Repression and Retaliation/False Arrest/Malicious Prosecution" against Buschak and Scaletta.[7]

On January 6, 2014, the parties filed cross-motions for summary judgment. Plaintiff seeks summary judgment as to Counts I through IV, which relate to the August 18th and October 20th meetings, and Defendants request summary judgment as to all of Plaintiff's claims. While the motions were pending, Defendants filed a notice informing the Court and Plaintiff of Buschak's death on March 23, 2014. On June 13, 2014, Plaintiff filed a timely motion seeking to

---

6.    Count IV names the "School Board" as a defendant, even though Plaintiff, through his former counsel, was supposed to have amended his pleading to "remove[] the school board and substitute[] the school district as a party defendant." Pl.'s Mot. for Leave to Am. at 1 (ECF No. 10). The Court will assume that this was simply an oversight. It will not affect the substantive analysis of this claim.

7.    Plaintiff concedes that since Buschak was not serving as the presiding officer at the December 8th meeting, the false arrest and malicious prosecution claims against her stemming from what allegedly transpired after that meeting must fail. Pl.'s Br. in Opp. at 13 (ECF No. 82). Thus, the Court's discussion of the false arrest and malicious prosecution claims will focus only on Scaletta.

substitute "Eric Purchase, Esq., Personal Representative of the Estate of Mona Buschak in her individual and official capacities" for Buschak as a Defendant in this case. The Court granted Plaintiff's motion on June 16, 2014, and the caption has been amended accordingly. For ease of reference, however, the Court will continue to refer to "Buschak" throughout the remainder of this Opinion.

## II. Legal Standard

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court must examine the facts in a light most favorable to the nonmoving party. *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 898 F.2d 946, 949 (3d Cir. 1990). The moving party bears the burden of demonstrating the absence of any genuine issues of material fact. *U.S. ex re. Quinn v. Omnicare Inc.*, 382 F.3d 432, 436 (3d Cir. 2004). Rule 56, however, mandates the entry of judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, the nonmoving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex*, 477 U.S. at 325). Distilled to its essence, the summary judgment standard requires the nonmoving party to create a "sufficient disagreement to require

submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

This standard remains the same when the parties have filed cross-motions for summary judgment. *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006). "When confronted with cross-motions for summary judgment, . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x. 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Id.* (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

## III.    Discussion

Section 1983 does not create substantive rights, but rather provides a remedy for the violation of rights created by federal law. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). Accordingly, to succeed on a § 1983 claim, a plaintiff to demonstrate (1) that the alleged wrongful conduct was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000). There is no dispute about the first requirement. Rather, the parties disagree on whether Plaintiff can establish a deprivation of a federally protected right.

### A.    The First Amendment Claims

Plaintiff alleges that Buschak violated his First Amendment rights to freedom of speech and to petition the government for redress of grievances when she interrupted his presentations at

the August 18th, October 20th, and November 17th Board meetings.[8] He also alleges that

Scaletta violated his First Amendment rights at the October 20th meeting by directing him to

leave the premises after Buschak cut him off and told him to sit down. Finally, Plaintiff alleges

that the School District should be concomitantly liable for the underlying constitutional

violations allegedly committed by Buschak and Scaletta under a *Monell* theory of liability.[9]

Plaintiff moves for summary judgment as to the claims related to the August 18th and

October 20th meetings. He concedes that Policy 903 is facially valid, both in its original form

and as amended on October 20, 2010. He alleges, however, that Buschak and Scaletta applied the

---

8. Although the right to free speech and the right to petition are separate rights, the Supreme Court has explained that they are "essentially the same" and are subject to the same analysis. *Wayte v. U.S.*, 470 U.S. 598, 610 n.11 (1985). The Court notes that the Amended Complaint also makes reference to three other legal theories implicating the First Amendment: "Official Oppression and Intimidation," "Denial of Right to Speak and be Heard by the School Board of Directors," and "Violation of First Amendment Right to Speak in a Public Forum." "Official oppression" is a criminal offense under Pennsylvania law, the violation of which does provide a basis for bringing a claim under § 1983. *See Troutman v. Bartlett*, No. 11-315, 2012 WL 6808559, at \*1 n.3 (W.D. Pa. Dec. 4, 2012), *report and recommendation adopted*, 2013 WL 85252 (W.D. Pa. Jan. 8, 2013). Accordingly, since that is the only legal theory raised in Count III, Defendants are entitled to summary judgment as to that Count. Moreover, the other two First Amendment Counts appear to be, for all intents and purposes, simply alleging violations of Plaintiff's rights to free speech and to petition at the October 20th and November 17th meetings, despite the different titles ascribed to them. It is possible that Plaintiff intended to pursue a claim for First Amendment retaliation based on various statements made to him and conduct directed to him by Defendants and others at the Board meetings, as the Amended Complaint and Plaintiff's briefing make several references to retaliation. He has not, however, addressed the framework for analyzing retaliation claims or otherwise developed this theory in any meaningful way, so the Court will not consider it.

9. When a public official is sued in his or her official capacity, it is really just another way of suing the government entity, itself. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Thus, because the School District is also named in this action, the Court will not separately analyze the official-capacity claims against Buschak and Scaletta. The Court also notes that since Buschak was no longer serving as School Board president when Plaintiff commenced this action, it was actually improper for Plaintiff to have named her as a defendant in her official capacity. *See Mass. Hosp. Ass'n, Inc. v. Harris*, 500 F. Supp. 1270, 1283 (D. Mass. 1980); *Michalik v. Hermann*, No. 99-3496, 2001 WL 434489, at \*2 (E.D. La. Apr. 26, 2001). Ultimately, however, that is immaterial because the District has also been named.

Policy in an unconstitutional manner, using it as "a pretext to silence [him] through characterizing his constitutionally protected and critical viewpoints of the Defendants as 'disruptive' or 'harassing' and therefore prohibited." Pl.'s Br. in Opp. at 10 (ECF No. 80). Moreover, he argues that insofar as Buschak relied on the restrictions in the August 24th letter in ending his presentation at the October 20th meeting – restrictions that only applied to Plaintiff – this amounted to a "constitutionally invalid viewpoint and speaker-specific limitation on participation," entitling him to judgment as a matter of law. *Id.* at 8.

Buschak and Scaletta move for summary judgment as to each of the claims against them. According to Defendants, each time Plaintiff was called out of order, it was "due to the repetitive, harassing and disruptive nature of his speech and not the viewpoint he espoused." Def.'s Br. in Opp. (ECF No. 75). These Defendants also argue that they are entitled to qualified immunity. For its part, the School District contends that it is entitled to summary judgment because Plaintiff has not established that it maintained a policy, custom, or practice that caused the alleged constitutional violations.

### 1.    General Principles of Law

The law governing Plaintiff's First Amendment claims is well settled. The extent to which the government may restrict speech depends on whether the speech occurs in a traditional public forum, a designated public forum, or a limited public forum. *Galena v. Leone*, 638 F.3d 186, 197 (3d Cir. 2011) (citation omitted). The parties agree that a school board meeting is a limited public forum. Thus, "content-based restraints are permitted, so long as they are designed to confine the forum to the limited and legitimate purposes for which it was created." *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 280 (3d Cir. 2004). However, viewpoint-based restrictions are presumptively invalid. *Galena*, 638 F.3d at 197 (citation omitted). Applying this framework,

courts have recognized that the presiding officer at a public meeting may require speakers to limit their comments to agenda items and avoid being repetitive. *See, e.g.*, *White v. City of Norwalk*, 900 F.2d 1421, 1425 (11th Cir. 1989); *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 433 (6th Cir. 2009). Likewise, a presiding officer may "have a speaker removed when she becomes disorderly," *Miller v. N. Belle Vernon Borough*, No. 08-4135, 2010 WL 4388069, at *5 (W.D. Pa. Oct. 29, 2010) (citation omitted), or otherwise ignores "the rules of decorum," so as to jeopardize the orderly functioning of the meeting, *Eichenlaub*, 385 F.3d at 281.

At the same time, "citizens have a right, subject to basic restrictions of good order, to be difficult, even offensive to public officials on matters of public concern." *Wilkinson v. Bensalem Twp.*, 822 F. Supp. 1154, 1160 (E.D. Pa. 1993). A public official presiding over a meeting in a limited public forum may not, therefore, make *ad hoc* parliamentary rulings simply because she disagrees with the speaker's viewpoint or because the speaker is critical of her. *Miller*, 2010 WL 4388069, at *5 (citations and quotations marks omitted); *Teufel v. Princeton City Sch. Dist. Bd. of Educ.*, No. 12-355, 2013 WL 143808, at *12 (S.D. Ohio Jan. 11, 2013). The upshot of these cases is this: if a ruling is made "to keep a meeting under control, and free from irrelevant disruption, then it may be permissible," but "if there was no reasonable basis for fearing disruption, or the purpose of the enforcement was to prevent or punish an expression of opinion," the ruling is unconstitutional. *Miller*, 2010 WL 4388069, at *5 (citations and quotations marks omitted). All a plaintiff must do is "'identify affirmative evidence from which a jury could find'" that the presiding officer acted for the latter, impermissible reason in order to survive summary judgment. *Monteiro v. City of Elizabeth*, 436 F.3d 397, 406 (3d Cir. 2006) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998)). With that background, the Court will address the claims against Buschak and Scaletta *seriatim*.

## 2. The Claims against Buschak

The Court will separately analyze Plaintiff's conduct, and Buschak's response thereto, at each of the meetings at issue. The critical question, based on the principles set forth above, is whether the evidence points unquestionably to the conclusion that Buschak "acted only to maintain order," or whether there is some affirmative evidence that Plaintiff's "viewpoint or identity" – and not fear of actual disruption of the meeting – "was the motivating factor behind [her] decision." *Ansell v. Ross Twp.*, No. 09-1398, 2012 WL 1038825, at *25 (W.D. Pa. Mar. 28, 2012) (internal citation and quotation marks omitted.).

### a. The August 18th Meeting

The Court finds that there is a genuine issue of material fact with respect to Buschak's motive for cutting off Plaintiff's presentation at this meeting. At the time, Policy 903 gave Buschak the authority to interrupt speakers only if they "(a) stray[ed] from the topic, (b) bec[a]me obscene, loud, or abusive, [or] (c) bec[a]me slanderous." When Buschak cut Plaintiff off, she did not make reference to any of those reasons as the basis for her decision. Instead, just after Plaintiff complained that Bucshak had mischaracterized him at the prior month's meeting, she exclaimed that she was not going to permit him to "bad mouth her or anybody else on this Board," ordered him to sit down, and eventually threatened to call the police. "Given that [Buschak] arguably appeared to be offended by [Plaintiff's] criticism of the Board immediately before terminating his comments," a jury could find that her "true motivation for ejecting [Plaintiff] from the meeting was to suppress [his] viewpoint." *Id.* at *27.

When Buschak did finally refer to the Policy during the exchange with Plaintiff, she stated only that he was "off topic" and had "crossed the line." To be sure, if Plaintiff had veered far afield from his proposed topic of discussion – say, by discussing "his child's birthday party"

or some other topic entirely unrelated to the workings of the Board – Buschak could have reined him in without running afoul of the First Amendment. *Galena*, 638 F.3d at 211 (citing *Eichenlaub*, 385 F.3d at 281). However, it is not clear beyond peradventure that Plaintiff's speech actually was "off topic" in any sense of that phrase. At the time, speakers were not limited to discussing agenda items, so any topic reasonably related to the School District's operation was open for discussion. Moreover, a reasonable jury could find that because Plaintiff's proposed topic – the District's "lack of openness, transparency and accountability" – was so broad, it arguably encompassed his complaint about Buschak's alleged mischaracterization of him. That would strengthen the inference that Buschak was employing the Policy as a cover for suppressing protected speech. By the same token, Defendants concede that Plaintiff's comments at prior "Board meetings covered a broad range of topics, frequently meandering from topic to topic." Def.'s CSMF ¶ 11 (ECF No. 67). Yet there is no evidence that Buschak called Plaintiff out of order for straying "off topic" at those meetings. Only when he allegedly veered from his topic to criticize Buschak for mischaracterizing him was she quick to cut him off. That suggests that it was his viewpoint that prompted the decision.

Although Buschak only ever accused Plaintiff of veering "off topic," Defendants now attempt to liken his conduct to that in *Eichenlaub*, 385 F.3d at 279-81 and *Olasz*, 301 F. App'x at 145-46. However, the Court is not prepared to say, as a matter of law, that Plaintiff was creating an actual disturbance *before* Buschak cut him off. He had complied with all of the then-existing requirements in Policy 903 by calling ahead to have his name placed on the agenda; announcing his name and address before his presentation; and stating the topic that he would be addressing. Then he delivered his presentation in a calm, measured tone, and he was still within his allotted 10 minutes when Buschak interjected. It was only *after* Buschak interrupted him that he became

arguably defiant. By that point, however, to the extent there was a constitutional violation, it had already taken place.

In sum, there is a genuine issue of material fact as to Buschak's motivation for cutting off Plaintiff's presentation. There is sufficient evidence from which a jury could find that she did so because she disagreed with his criticism of her. At the same time, the Court cannot conclude that she did in fact act unlawfully. She might have truly been believed that Plaintiff had veered from his originally stated topic in such a way that put the orderly operation of the meeting in jeopardy. The finder of fact must decide this question. Accordingly, Buschak's motion for summary judgment as to Counts I and II must be denied.[10] For those same reasons, Plaintiff's motion for partial summary judgment on Counts I and II must also be denied.

### b.       The October 20th Meeting

The Court reaches a different conclusion with regard to the October 20th meeting. Buschak could lawfully restrict Plaintiff's speech to items on the meeting's agenda and prevent him from presenting on a topic that he had discussed at several prior Board meetings. The fact that Buschak referred to the August 24th letter when she cut off Plaintiff's presentation does not, as Plaintiff argues, establish that the decision was viewpoint based since there is no evidence that other speakers were allowed to speak on matters that were not on the agenda or were allowed to present on topics that they had discussed in the past, which might suggest viewpoint discrimination. Accordingly, Buschak is entitled to summary judgment on the claim stemming

---

10.     Buschak also argues that she is entitled to qualified immunity. "Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury." *Monteiro*, 436 F.3d at 406. Thus, in this case, since there is a disputed issue of material fact as to the Buschak's motive, her motion for summary judgment on the basis of qualified immunity must be denied. "[I]f [she] acted with an intent to suppress [Plaintiff's] speech on the basis of viewpoint, [she] violated clearly established law and [are] not entitled to qualified immunity." *Id.*

from the October 20th meeting.[11]

### c.     The November 17th Meeting

The Court reaches the same conclusion with regard to the November 17th meeting, which took place after Policy 903 was formally amended to include the agenda-item restriction and to restrict duplicative and repetitive presentations. Since Plaintiff was attempting to again present on the issue of bullying, which again was not the meeting's agenda, Buschak had every right to "confin[e] the discussion to the purpose of the meeting." *See Eichenlaub*, 385 F.3d at 280-81. Even viewing the evidence in the light most favorable to Plaintiff, the nonmoving party, it is insufficient to support a contrary conclusion.

Plaintiff attempts to create a genuine issue of material fact by pointing to incidents when the amended version of Policy 903 was allegedly applied inconsistently, such that speakers were permitted to present on items not on the agenda. Inconsistent or selective application of the restriction could bolster a claim of viewpoint discrimination. *See Miller*, 2010 WL 4388069, at *5. However, the evidence Plaintiff has presented in this regard fails to do so. In particular, none of the individuals identified by Plaintiff were similarly situated to him because they had not been permitted to present on the same topic at some seven Board meetings prior to being cut off, as Plaintiff had done. Even if these individuals were similarly situated, Buschak was not even the Board president when the three incidents identified by Plaintiff occurred. Thus, the incidents fail to show that *she* applied the Policy inconsistently after it was amended, and there is no other

---

11.     The Court also notes that after the brief interruption by Buschak, Plaintiff completed his 10-minute presentation on bullying, albeit to a near-empty room. Plaintiff claims that Buschak violated his Constitutional rights by "eliminate[ing] the forum for participation," but has not cited any authority in support of that proposition. Since Plaintiff expressed all of the views he came to the meeting to express, the Court is hard pressed to find any constitutional violation. *See Brown v. City of Lafayette*, No. 08-69, 2010 WL 1570805, at *7 (N.D. Ind. Apr. 16, 2010) (finding no violation where plaintiff "remained free to express his views and publicly criticize the council when he continued speaking after the brief interruption; and in fact, he did so").

evidence to that effect. Buschak is entitled to summary judgment on Count V.

## 2. The Claim against Scaletta

The Court finds the claim against Scaletta for his conduct at the August 18th meeting highly problematic. As an initial matter, this claim raises serious questions of causation. *See Hector v. Watt*, 235 F.3d 154, 160 (3d Cir. 2000) (recognizing that the common law of proximate cause applies in § 1983 actions). It is undisputed that Scaletta did not call Plaintiff out of order. Nor did he call the police regarding Plaintiff – that was done by either Fox or McDonald, and there is no evidence that either of them did so at Scaletta's behest. While Scaletta did tell Plaintiff that he had to leave the premises in the midst of the exchange with Buschak, Plaintiff refused to heed that directive. Eventually, it was the state trooper, not Scaletta, who directed Plaintiff off the property. Thus, Scaletta's conduct (telling Plaintiff to leave the premises) seems too far removed from the alleged constitutional harm (the silencing of Plaintiff's arguably protected speech and his subsequent removal from the meeting) to impose liability on him. *See Brown*, 2010 WL 1570805, at *7 (citations omitted) ("An attempt to violate constitutional rights is not actionable; there must be an actual violation of the right.").

Even if Scaletta could be held liable for telling Plaintiff to leave without actually causing him to do so, Plaintiff would still have to adduce sufficient evidence to show that Scaletta shared Buschak's arguably impermissible motive in order to survive summary judgment. *Ansell*, 2012 WL 1038825, at *28. But there is no evidence to that effect. At any rate, "[g]iven a clear directive from [Buschak], and a question of fact whether that directive was reasonable," a reasonable official in Scaletta's position "could have believed – even if mistakenly – that it was" constitutional for him to tell Plaintiff he had to leave the meeting after he refused to follow Buschak's order. *Miller*, 2010 WL 4388069, at *9. Accordingly, insofar as Scaletta did violate

Plaintiff's rights, he would nonetheless be entitled to qualified immunity. His motion for summary judgment will be granted as to the claims in Counts I and II.

### 3. The Claim against the School District

Because one of Plaintiff's First Amendment claims will proceed to trial, the Court must decide whether his attendant claim against the School District should proceed, as well. A political subdivision or local governmental entity, such as a school district, may not be held vicariously liable under § 1983 for the alleged constitutional violations of its employees. *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Such an entity may, however, be held liable for violations of federal rights arising from the implementation of its own unlawful policy or practice. *Connick v. Thompson*, --- U.S. ----, 131 S. Ct. 1350, 1359 (2011) (citations omitted). Interpreting the Supreme Court's decisions regarding the scope of *Monell* liability, the Third Circuit Court of Appeals has recognized at least three circumstances when "[a]n individual's conduct implements official policy or practice":

> when (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred.

*Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (citations omitted).

In this case, the second scenario is implicated: the School District may be held liable if Buschak was a final policy-maker when she cut off Plaintiff's presentation at the August 18th meeting. To decide "if an official has final policy-making authority, and can thus bind the municipality by his conduct, a court must determine (1) whether, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question

and (2) whether the official's authority to make policy in that area is final and unreviewable." *Id.* (internal citations omitted). Under Pennsylvania law, a school board president is authorized to preside over all school board meetings. 24 P.S. § 4-426. Moreover, 24 P.S. § 4-407 delegates each school board the power to "adopt reasonable rules and regulations for its government and control." Consistent with that grant of authority, the General McLane School Board adopted Policy 903, which gave Buschak the authority to declare speakers out of order, and her decision was non-reviewable. Buschak was, therefore, the final policymaker with respect to School District action take during the Recognition of Visitors portion of the Board meetings. If she is held liable, then the District may be held liable, as well, and its motion for summary judgment must be denied. *See Ritchie v. Coldwater Comm. Schs.*, 947 F. Supp. 2d 791, 810-11 (W.D. Mich. 2013) ("Acting for the School Board, [the defendant-president] applied the policy as the basis for cutting off [plaintiff's] speech . . . [A] reasonable jury could find that [the president's] acts constituted School Board policy."); *Besler v. Bd. of Educ. of West Windsor-Plainsboro Reg. Sch. Dist.*, 993 A.2d 805, 811 (N.J. 2010) (The "Board President was acting as a final policymaker while presiding over the public comment period of the Board meeting and therefore the Board could be held liable for a violation of [plaintiff's] First Amendment rights.").

### C. The False Arrest Claim

In Count VI, Plaintiff alleges that he was falsely arrested in violation of his Fourth Amendment rights.[12] Because this claim is rooted in the Fourth Amendment's protection against

---

12. It is not disputed that Scaletta did not actually arrest Plaintiff. Nonetheless, courts have "found that false arrest/false imprisonment claims can be brought against an individual other than the arresting officer when that person 'instigates' the arrest." *O'Hara v. Hanley*, No. 08-1393, 2009 WL 2043490, at *5 (W.D. Pa. July 8, 2009) (citing *Lopez v. City of N.Y.*, 901 F. Supp. 684, 688 (S.D.N.Y. 1995); *Fowler v. Robinson*, No. 94–936, 1996 WL 67994 (N.D.N.Y. Feb. 15, 1996); *Shattuck v. Town of Stratford*, 233 F. Supp. 2d 301, 313–14 (D. Conn. 2002)). Because Plaintiff's false arrest claim fails for other reasons, the Court will assume, without

unreasonable seizures, it should go without saying that if a plaintiff was never "arrested" or "seized" within the meaning of the Fourth Amendment, then his claim fails out of the gate. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994). Although a plaintiff need not prove that he was formally "arrested," he must at least be able to show that he was "treated in a manner that approximates a formal arrest." *Harper v. Borough of Pottstown*, No. 11–1939, 2013 WL 1187051, at *8 (E.D. Pa. Mar. 21, 2013). "[A]ll of the circumstances surrounding the incident" must have been such that "a reasonable person would have believed that he was not free to leave . . . or otherwise terminate the encounter." *Brendlin v. California*, 551 U.S. 249, 255 (2007).

There is no question that Plaintiff was not formally "arrested" at the December 8th meeting: he was never told he was under arrest, never handcuffed, never taken into custody, and never physically restrained in any way. Furthermore, the receipt of a summons in the mail requiring him to appear for fingerprinting and to attend a preliminary hearing is "insufficient to constitute an arrest or seizure of the person required under the Fourth Amendment to sustain a claim for false arrest." *Moyer v. Borough of N. Wales*, No. 00-1092, 2001 WL 73428, at *2 (E.D. Pa. Jan. 25, 2001). Nor has Plaintiff adduced any evidence suggesting that his freedom of movement was restrained in a manner that "approximate[d] a formal arrest." *Harper*, 2013 WL 1187051, at *8. There is no evidence that either of the troopers laid a hand on him, acted intimidatingly, displayed a weapon, or used language that would have led a reasonable person to believe that he was not free to walk away and end the encounter. *See U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980) (identifying factors to consider in deciding whether an "arrest" occurred). And while he was directed to leave, complying without incident, that alone "does not transform the encounter into a seizure" since "a reasonable person would feel free to go about [his]

---

deciding, that Plaintiff could establish that Scaletta instigated his arrest.

business (even if [he] was instructed to go elsewhere)." *Bach v. Milwaukee Cnty. Cir. Ct.*, No. 13-370, 2013 WL 4876303, at *10 (E.D. Wis. Sept. 11, 2013); *accord Laverdi v. Jenkins Twp.*, 49 F. A'ppx 362, 364 (3d Cir. 2002) ("Although [plaintiff] was escorted from the meeting, he left freely and was never touched by the police officer – a far cry from a full-scale arrest."); *Gale v. Storti*, 608 F. Supp. 2d 629, 633 (E.D. Pa. 2009) (explaining that a plaintiff could not establish that he was "seized" by showing that "he did not want to leave the premises, but was forced to").

Plaintiff makes much of the fact that one of the troopers placed his hand on his Taser while Plaintiff was retrieving his camera equipment from the meeting room. This act made it "unmistakably clear," according to Plaintiff, "that [he] would face immediate physical harm and further consequences if he did not obey the trooper's directives." Pl.'s Br. in Opp. at 20-21 (CF No. 80). A review of the video footage, however, undermines Plaintiff's attempt to spin this bit of evidence in his favor. Although the trooper did very briefly place his hand on his Taser, he never removed it from its holster, let alone pointed it at Plaintiff or made any other kind of threatening gestures toward him. Indeed, at the time, Plaintiff was standing several feet away, and from his vantage point, it is unclear whether he could have even observed the trooper's hand. Tellingly, he said nothing about it in his deposition. Without any evidence that the trooper wielded the Taser in a menacing or threatening manner, its mere presence on the trooper's waist is not enough to turn this encounter into an "arrest." Accordingly, because Plaintiff was not "arrested," his false arrest claim fails, and Scaletta is entitled to summary judgment on this aspect of Count VI.[13]

---

13. Plaintiff, relying on *Angle*, 1998 WL 54400, argues at several points throughout his brief that his "arrest" was *per se* unlawful because the state troopers "arrested" him without having witnessed his allegedly disruptive conduct. Since Plaintiff was never "arrested," this argument is a nonstarter. Even if Plaintiff had been arrested, however, *Angle* would not necessarily dictate a different result since the portion of that decision on which Plaintiff relies rests on a

### D.    The Malicious Prosecution Claim

Plaintiff also alleges a malicious prosecution claim in Count VI. It is unclear whether this claim is based on the First Amendment or the Fourth Amendment.[14] *See Torres v. McLaughlin*, 163 F.3d 169, 172-73 (3d Cir. 1998) (recognizing that a malicious prosecution claim may be grounded in "police conduct that violates the Fourth Amendment, the procedural due process clause or other explicit text of the Constitution"); *Johnson v. Knorr*, 477 F.3d 75, 82 n.8 (3d Cir. 2007) (noting that a "constitutional malicious prosecution claim might be brought raising a First Amendment claim"). In either case, a plaintiff must establish that: "(1) the defendants initiated a criminal proceeding, (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) [and] the defendants acted maliciously or for a purpose other than brining the plaintiff to justice . . . ."[15] *Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir.

---

fundamentally flawed premise. It is true, as the court in *Angle* observed, that "[t]here are very few rules of police conduct so clearly delineated as that an officer shall not, unless authorized by statute, make a warrantless arrest of a person charged with a misdemeanor not committed in the officer's presence." *Id.* at *3. But contrary to the *Angle* court's reasoning, the Court of Appeals has "never held that an arrest that is unlawful under state or local law is unreasonable *per se* under the Fourth Amendment." *U.S. v. Laville*, 480 F.3d 187, 192 (3d Cir. 2007). Instead, whether the "arrest" is unlawful under state law is "at most a factor that a court may consider in assessing the broader question of probable cause." *Id.*

14.    When alleging a Fourth Amendment-based malicious prosecution claim, a plaintiff has to show that he was "seized" as a result of the proceeding, in addition to the elements of the common law tort. *Posey v. Swissvale Borough*, No. 12-955, 2013 WL 989953, at *8 (W.D. Pa. Mar. 13, 2013) (citing *Johnson*, 477 F.3d at 82 n.8). But that is not so with respect to First Amendment claims. *Id.* While the Court of Appeals has recognized that "[p]retrial custody and some onerous types of pretrial, non-custodial restrictions constitute a Fourth Amendment seizure," it is not clear that the bond condition imposed on Plaintiff would rise to the necessary level. *Dibella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005). Because it is unclear which theory Plaintiff is pursuing, the Court need not decide that question and will instead focus on the other elements.

15.    "The analysis of the malicious prosecution claim with regard to [initiation-of-the-proceeding] requirement is substantially the same as the analysis for the false arrest claim . . . ." *Bertuglia v. City of N.Y.*, 839 F. Supp. 2d 703, 723 (S.D.N.Y. 2012). As it did with respect to the

2009). The favorable termination element is considered a threshold requirement. *Hilfirty v. Shipman*, 91 F.3d 573, 575 (3d Cir. 1996). Only if it is met "must a district court engage in an analysis of the probable cause element . . . ." *Kossler*, 564 F.3d at 187. Moreover, in cases such as this, where an individual is charged with more than one crime, "the favorable termination of some but not all individual charges does not necessarily establish the favorable termination of the criminal proceeding as a whole." *Id.*

Plaintiff was initially charged with disorderly conduct and disrupting a meeting, but the disorderly charge was dismissed at the preliminary hearing. Although that would clearly amount to a favorable termination, unless the disruption charge also terminated favorably for Plaintiff, he cannot show that the proceeding as a whole terminated in his favor. The disruption charge was bound over for trial and *nolle prossed* after Plaintiff reached an agreement with the DA's office. "[W]hile 'a grant of *nolle prosequi* can be sufficient to satisfy the favorable termination requirement for malicious prosecution, not all cases where the prosecutor abandons criminal charges are considered to have terminated favorably.'" *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) (quoting *Hilfirty*, 91 F.3d at 579-80). Rather, it is sufficient only when the circumstances "*indicate the innocence of the accused.*" *Id.* (internal quotation omitted) (emphasis in original). That is not the case when a defendant receives a *nolle prosequi* after entering into a compromise agreement with the prosecution because unlike when a DA "seeks a grant of *nolle prosequi* because of insufficient evidence," a compromise does not establish the accused's innocence. *Id.*

Plaintiff's claim runs headlong into the rule established in *Hilfirty* and *Donahue*, since there are no facts suggesting that Sambroak *nolle prossed* the charge because Plaintiff was

false arrest claim, the Court will assume for this discussion that Scaletta "initiated" the criminal proceeding against Plaintiff, as this claim fails for other reasons.

innocent. To the contrary, Sambroak expressly maintained that there was sufficient evidence to take Plaintiff to trial. He only agreed to the *nolle prosequi* because he felt there was nothing left to gain from going through with the prosecution: the possible sentence would not have achieved anything greater than what had been achieved by keeping Plaintiff away from Board meetings until December 2011. *See Donahue*, 280 F.3d at 384 (concluding that the favorable-termination requirement was not met where "prosecutor simply reasoned that Donahue was not likely to receive any additional jail time if convicted in a retrial, and concluded that further prosecution was therefore not an appropriate use of limited resources). In fact, Sambroak even reserved the right to reinstate the charge if Plaintiff failed to comply with the terms of the compromise agreement, which hardly suggests that he believed Plaintiff was innocent.

Notwithstanding the existence of the compromise agreement, Plaintiff makes two attempts to remove his case from the rule in *Donahue* and *Hilfirty*. Neither of these arguments is persuasive.

First, he argues that the eventual expungement of his record establishes that the proceeding terminated in his favor. The Court cannot agree. While expungement might "erase[] 'the stigma that might otherwise be borne by the defendant,'" it does not definitively establish his innocence. *Gilles v. Davis*, 427 F.3d 197, 211 (3d Cir. 2005) (quoting *Singleton v. City of N. Y.*, 632 F.2d 185, 193–95 (2d Cir. 1980)). For instance, in *Gilles*, the Court of Appeals held that the plaintiff's placement in Pennsylvania's Accelerated Rehabilitative Disposition ("ARD") program was not a favorable termination, even though it resulted in expungement of his arrest record, because "the ARD program imposes several burdens upon the criminal defendant not consistent with innocence[.]" *Id.* Such is also the case in this instance. By entering into the agreement with the DA's office, Plaintiff effectively said that he valued ending the proceeding

more than he valued "establishing his innocence" in court. *Junod v. Bader*, 458 A.2d 251, 253 (Pa. Super. Ct. 1983) (citations omitted).[16] And as a result, he accepted at least two burdens that are inconsistent with his continued claim of innocence: he agreed not to attend Board meetings and to pay associated court costs. *See Gilles*, 427 F.3d at 197 (identifying "restitution . . . imposition of costs, and imposition of a reasonable charge relating to the expense of administering the program" as "burdens . . . not consistent with innocence"). The expungement does not change that, irrespective of whether Sambroak did not object to it.

Second, Plaintiff contends that "all existing evidence, and in particular the testimony introduced at the preliminary hearing, affirmatively defeated the elements of intent under both charges." Pl.'s Br. in Opp. at 24 (ECF No. 80). Thus, according to Plaintiff, he has demonstrated his "actual innocence" of the crimes charged. Again, the Court cannot agree. Plaintiff does not dispute that he called out "point of order" during a portion of the meeting when public comment was no longer invited and when he had no First Amendment right to speak. *See Galena*, 638 F.3d at 212 ("Regardless of how the Pennsylvania General Assembly supplemented free speech rights when it enacted the Sunshine Act, the First Amendment simply does not require that all members of the public be permitted to voice objections to the Council's procedures any time they desire to do so."). While Plaintiff was arguably not disruptive as that term is commonly understood, that is beside the point. "The interruption of the order of business [was] itself the disturbance," insofar as it required the Board to turn its attention away from its business and deal with Plaintiff's

---

16. Plaintiff argues that cases involving the ARD program such as *Junod* are inapplicable here because placement in ARD, unlike Plaintiff's agreement with the Commonwealth, "affirmatively contemplates that the plaintiff was not innocent of the conduct charged." Pl.'s Br. in Opp. at 23 (ECF No. 80). Plaintiff is entirely mistaken about the nature of ARD. A defendant who enters ARD "*does not admit guilt*." *Gilles*, 427 F.3d at 209 (emphasis added). That leaves a defendant who enters ARD in the same position that Plaintiff was in after entering the compromise agreement with the DA's Office: not necessarily admitting guilt, but also wholly unable to assert his innocence any longer.

comment. *Id.* When considered within this framework, it is immaterial that the Commonwealth apparently did not introduce evidence of Plaintiff's intent at his preliminary hearing. The timing of his comments alone would permit the inference that he intended to disrupt the orderly flow of the meeting, which is all the statute requires. *See Com. ex rel. Lagana v. Com. Office of Atty. Gen.*, 662 A.2d 1127, 1129-30 (Pa. Super. Ct. 1995) (explaining that under Pennsylvania law intent can be inferred from circumstantial evidence).

Because Plaintiff cannot demonstrate that the criminal proceeding as a whole terminated in his favor, he cannot advance a claim for malicious prosecution. Defendants will be granted summary judgment on this aspect of Count VI.

**IV.    Conclusion**

For the reasons hereinabove set forth, Plaintiff's motion for partial summary judgment will be **DENIED** in all respects. Defendants' motions for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MATTHEW TIGHE**, | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **1:11-cv-224** |
| | ) |
| **ERIC J. PURCHASE**, *personal administrator of the Estate of Mona Buschak, individually and in her official capacity as President of the General McLane School Board*; **RICK SCALETTA**, *individually and in his official capacity as school superintendent*; and **BOARD OF EDUCATION OF THE GENERAL MCLANE SCHOOL DISTRICT**, | ) ) ) ) ) ) ) ) ) |
| **Defendants.** | ) ) |

## ORDER OF COURT

    **AND NOW**, this 7th day of July, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** as follows:

    (1) the MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 63) filed by Plaintiff is **DENIED** in all respects;

    (2) the MOTION FOR SUMMARY JUDGMENT OF DEFENDANT GENERAL MCLANE SCHOOL DISTRICT (ECF No. 66) is **GRANTED** as to the false arrest and malicious prosecution claims, and **DENIED** as to the First Amendment claim arising out of Bucshak's alleged conduct at the August 18, 2010 meeting; and

    (2) the MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS MONA BUSCHAK AND RICK SCALETTA (ECF No. 70) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted insofar as it seeks summary judgment for Eric J. Purchase, as the administrator of the Estate of Bucshak, on the First Amendment claims in Count III, IV, and V and the false arrest and malicious prosecution claims in Count VI; granted insofar as it seeks

summary judgment for Scaletta on all of Plaintiff's claims; and denied insofar as it seeks summary judgment for Eric J. Purchase, as the administrator of the Estate of Bucshak, Counts I and II. It is hereby **ORDERED** that Scaletta is dismissed as a Defendant in this action.

**IT IS FURTHER ORDERED** that the caption of this action is hereby amended as follows:

| | |
|---|---|
| **MATTHEW TIGHE**, )<br>          **Plaintiff**, )<br> )<br>       **v.** )<br> )<br> )<br>**ERIC J. PURCHASE**, *personal administrator of* )<br>*the Estate of Mona Buschak, individually and in her* )<br>*official capacity as President of the General McLane* )<br>*School Board*, and **THE GENERAL MCLANE** )<br>**SCHOOL DISTRICT**, )<br>       **Defendants.** ) | **1:11-cv-224** |

On or before July 28, 2014, Plaintiff shall file his pretrial narrative statement. On or before August 18, 2014, Defendants shall file their pretrial narrative statements. A pretrial conference with the Court is scheduled on Friday, August 29, 2014 at 1:30 p.m. in Courtroom 6C, United States Courthouse, 700 Grant Street, Pittsburgh, PA 15219.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc:    **Elizabeth Farina Collura, Esquire**
       Email: ecollura@thorpreed.com
       **Robert J. Ridge, Esquire**
       Email: rridge@clarkhillthorpreed.com

       **Richard A. Lanzillo, Esquire**
       Email: rlanzillo@kmgslaw.com
       **Christopher J. Sinnott, Equire**
       Email: csinnott@mmbwslaw.com

**Gary Eiben, Esquire**
Email: geiben@tmgattys.com

(Via CM/ECF)